IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs March 21, 2018

**ANGEL GEOVANNA HURTADO v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2010-B-1624    Mark J. Fishburn, Judge**

_____

**No. M2017-00908-CCA-R3-PC**

_____

A Davidson County jury convicted Petitioner, Angel Geovanna Hurtado, of three counts of aggravated child abuse, one count of child neglect, and one count of reckless aggravated assault. She was sentenced to serve twenty-five years in the Tennessee Department of Correction. The judgment was affirmed on direct appeal. *State v. Angel Geovanna Hurtado*, No. M2014-00180-CCA-R3CD, 2014 WL 7417763 (Tenn. Crim. App. Dec. 30, 2014). Petitioner filed a timely petition for post-conviction relief. Following an evidentiary hearing, the post-conviction court dismissed the petition. Petitioner has appealed, asserting that she is entitled to relief based upon her trial counsel's ineffective assistance of counsel. Following a review of the briefs of the parties and the entire record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Kara L. Everett, Carthage, Tennessee, for the appellant, Angel Geovanna Hurtado.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Glenn R. Funk, District Attorney General; and Tammy Meade, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Background*

On direct appeal, this Court summarized the facts presented at trial as follows:

On June 15, 2010, a Davidson County grand jury charged [Petitioner] with four counts of aggravated child abuse and one count of aggravated child neglect, all involving her infant son, A.H., and all Class A felonies. *See* Tenn. Code Ann. §§ 39-15-401, -402. [Petitioner] proceeded to trial, where the following evidence was presented.

The victim's date of birth was [      ], 2008. In June 2009, [Petitioner] and her infant son moved to the Antioch residence of Vicente Jesus Gonzalez, [Petitioner's] boyfriend; Mr. Gonzalez was not the child's biological father. Prior to the move, [Petitioner] lived with her parents.

On October 27, 2009, the victim was taken to Southern Hills Hospital for an arm injury; there it was determined that the victim suffered a fracture in his left arm to the humerus, a bone in the upper arm. Following this visit, the case was referred to the Department of Children's Services (DCS) for further investigation as to the cause of the child's injuries. On October 28, the following day, Tiffany Rhodes, a DCS case worker, went to the address provided during the visit to Southern Hills, which turned out to be [Petitioner's] mother's home. [Petitioner's] family accompanied Ms. Rhodes to the correct location, the residence where [Petitioner] lived with Mr. Gonzalez. Mr. Gonzalez and [Petitioner] lied to Ms. Rhodes - Mr. Gonzalez provided a false identity, identifying himself to Ms. Rhodes as Jose Hurtado, [Petitioner's] brother, and they then stated that the residence belonged to Mr. Hurtado.

The following conversation transpired:

> Jose Hurtado stated he was the brother of [Petitioner], he stated he did not witness the child falling. He stated that he works late in the evening and when he get[s] home in the morning, he goes to sleep. He stated that he awoke around 12:30 p.m., and [Petitioner] explained to him about [the victim's] falling. He stated that [the victim] looked fine and was asleep. He stated that Southern Hills Medical explained that [the victim] had a strain in his left shoulder and a break in his left arm and sent the family home.

According to Ms. Rhodes's notes, she spoke with [Petitioner] in English that day. Also, the use of an interpreter was not mentioned during the conversation with either [Petitioner] or Mr. Gonzalez.

Following the interview with Ms. Rhodes, the child was taken to Vanderbilt Children's Hospital for further observation. Once there, the

victim was initially seen by Vanderbilt Pediatric Primary Care for assessment of the fracture to his left humerus bone. The record from Pediatric Primary Care, entered as an exhibit, reflects that [Petitioner], her brother, and a case worker were present with the victim when they arrived at the hospital. The history provided in that record states: "seen yesterday at So[uthern] Hills E[mergency] D[epartment and] diagnosed [with left] humerus fracture (after falling on an outstretched arm per mom). DCS involved [due to] possible spiral [fracture] of arm. Cont[inues] to be active [and] playful." The victim was then referred to Dr. Neil Green, a qualified expert in the field of pediatric orthopedic medicine and child abuse.

According to Dr. Green, a "hospital-based translator" was used to facilitate the conversation between himself and [Petitioner]. [Petitioner] provided the following explanation for the victim's injury to Dr. Green: "She told me that [the victim] was [thirteen]-months . . . and was just beginning to learn to walk, and she was helping him walk and he fell." According to Dr. Green's trial testimony, he took this statement to mean that the victim "fell on an outstretched arm[,]" but [Petitioner] made no mention of the victim's falling from a step or any height. However, Dr. Green authored the following statement after completing his evaluation of the victim, which was admitted as an exhibit: "The injury ([left] humerus [fracture]) is consistent with the story the mother gives as an explanation to his injury. Mom states [the victim] fell with an outstretched [left] arm down [one] step. This [left] humerus [fracture] can happen with this incident." Based upon Dr. Green's initial conclusion, no additional X-rays were taken of the victim that day.

At trial, Dr. Green clarified his conclusion regarding the left humerus injury:

> Fractures of the humerus, again the bone in the upper arm, do not occur in children below the age of [twelve] months as a result of accidental trauma. So whenever we see a young child with a fracture of the humerus, who is a non-walking child, we immediately feel that that is the result of non-accidental trauma until we can prove it otherwise.
>
> This particular child was [thirteen] months of age and was just beginning to walk, and the mom said that the child had fallen. I felt that was a possible explanation, but I was concerned about non-accidental trauma. The child was beginning to walk, he had been seen by DCS or Child Protective Services, and had also been seen

- 3 -

by pediatricians at Vanderbilt and there were no red flags raised so I didn't investigate this further.

Dr. Green testified that he did not have the benefit of the Southern Hills medical record or photographs of the steps outside [Petitioner's] residence at the time he made his initial conclusion.

Dr. Green was asked to further describe the victim's humerus fracture, stating that "[m]ost likely it's the result of some rotation or twisting injury." He continued,

> The bone itself can't rotate. The way the fracture could occur would be some rotation of the entire arm, probably with the elbow somewhat bent. A child could sustain a fracture like this with a fall on the arm, and then the body rotates around that arm that is fixed. It is unlikely in a young child of this age because their body mass is not quite large enough to do that, but in an older child that is how that would occur.

> Dr. Green opined that, if a person "violently" grabbed a child by the forearm and twisted it, then an injury like this one could occur. Stated another way, "this requires a fair amount of force in order to cause [this] particular injury[.]" According to Dr. Green, an injury like this one "causes a significant amount of pain[,]" and a child would be "more than crying, [would be] screaming." Following this fracture, "[a]ny motion of that arm [would] cause significant pain to [a] child until the arm [was] put at complete rest with a cast or a splint."

Prior to trial, Dr. Green was able to review the medical record from Southern Hills Hospital pertaining to the victim's visit on the preceding day, October 27, 2009. Dr. Green recalled that facility's notes said that the parent was unable to provide an explanation of how the injury occurred to the victim. The documentation from Southern Hills also "suggested that, [p]arent states that when they woke up this morning unable to move the left shoulder and cried when moved shoulder was what prompted them to bring the child to the hospital[.]" Based upon this history, Dr. Green opined that the injury would have had to occur sometime the day before.

Dr. Green stated that delay by a parent in seeking medical treatment was "a red flag" from the standpoint of a child abuse assessment and that a

change in story about the cause of an injury was also "a red flag." According to Dr. Green, if he had known this information - that [Petitioner] delayed in seeking treatment until the following day and that she changed her story about the cause of the victim's initial injury from October 27 (when none was provided) to October 28 (when she stated that the victim fell on outstretched arm)—he "would have investigated this child for non-accidental trauma and would have done every examination that [he] felt was necessary."

Dr. Green saw the victim for a follow-up visit on November 4. According to Dr. Green, the victim's "arm was fine, the bone was in good position[,]" on this occasion. He did not receive any information at that time that caused him additional concern for the victim's welfare.

The victim was seen again by Vanderbilt Pediatric Primary Care again on November 11 for head swelling, but he was then referred to the emergency department for a "full workup[.]" He was seen there by Dr. Andrea Bracikowski, a Vanderbilt Children's Hospital orthopedics doctor, who employed a translator to speak with [Petitioner]. Both [Petitioner] and the victim's uncle were present with the child, according to Dr. Bracikowski. Dr. Bracikowski asked [Petitioner] "if there was any reason for why [the victim] had swelling on his head[,]" and she stated that "he fell while walking outside, hitting the side of his head."

A CT scan was ordered and showed "a bilateral skull fracture." Additionally, swelling was visible on the CT scan: "most likely where the blunt trauma . . . occurred to his head, something hit him on the side of his head." According to Dr. Bracikowski, a "significant amount" of scalp swelling would have started "immediately or nearly immediately" after this "traumatic injury" to the victim's head, not three or four days later. Dr. Bracikowski described the fracture as "clearly a large skull fracture right on the side of his head that must have caused a significant amount of pain" and that the caregiver would have been aware of that pain. She further explained that the fracture "went from one side of the [victim's] head to the other side of the . . . head," crossing over a "suture line[.]" She opined that "to go all the way across and cause a fracture on the opposite parietal bone is very unusual and a nasty fracture[,]" and continued, "A tremendous amount of force was delivered bluntly to this child's skull." According to Dr. Bracikowski, it was "[h]ighly unlikely" that running into a wall could have generated sufficient force to cause this injury. She was asked,

Assuming the child was in a walker, fourteen-months old, the child in an attempt to get out of the walker, get[s] somewhat on top of it, he obviously would have to have climbed up to a certain height, and in that attempt to get out of the walker, that child tumbles out and hit[s] his head on a thick glass table, on the end of a thick glass table tumbling down and crashing on the bottom of the table's leg, could that height, from that type height, could an injury, a severe [head] injury occur if that had been the case?

to which she responded in the affirmative. Dr. Bracikowski also agreed that "some children . . . have a higher degree of tolerance for pain than others[.]"

The MRI (Magnetic Resonance Imaging) showed that the victim further suffered an epidural hemorrhage in his brain, which is a small area of bleeding between the skull and the brain. Dr. Bracikowski explained, "Epidural hematomas of the arterial type are very dangerous and life-threatening and there are many cases of patients coming in, they seem fine from their head and then they die." The victim was admitted to the hospital and placed under observation. If the parents waited three to four days following the head injury to seek treatment, this "absolutely" could have caused further injury to the victim, according to Dr. Bracikowski. "[I]n almost every circumstance, the parent or caretaker" would have taken the child immediately "somewhere to seek medical care" with this bad of a fall.

Also, a complete skeletal survey was performed. Dr. Bracikowski stated that it was her practice to keep the family members informed of the results of the X-rays. In addition to the previous humerus fracture and new skull fracture, older fractures to the victim's right ulna and left tibia were seen on the skeletal survey. "There were no outward signs for those injuries[.]" According to Dr. Bracikowski, these two fractures "were not the exact same age"; "the tibia fracture had a lot more healing[.]" Dr. Bracikowski opined that the "fracture of just the ulna implies . . . there was force": "The child put up his arm to defend himself from being hit and was struck in the ulna, that's not a classic fracture of a child who falls or a child who, you know, just accidentally twists their arm, whatever, that is a defensive wound." Dr. Bracikowski further stated, "[I]f a child's had enough force applied to a bone, either an arm or leg to cause a fracture, that child had to cry, had to have swelling, maybe bruising, not using that arm, limping, . . . if that child had a tibia fracture, that should be limping . . . ." It was possible one of these

additional fractures might have appeared on a skeletal survey if one had been conducted on October 28, the child's first visit to Vanderbilt with Dr. Green.

Dr. Bracikowski also described the prior humerus fracture as "very unusual" for a fall on an outstretched arm in a child this age, due to its "twisting" nature; and she had never seen such an injury before in a child this young. She opined that the history provided by [Petitioner] was inconsistent with this type of injury.

In conclusion, she stated that the victim's four fractures were "[m]ost likely" all caused by "different mechanisms" and at "different points in time[.]" Her "diagnosis was that this was all consistent with non-accidental trauma."

Sometime during the evening of November 11, Alissa Libonn, a Vanderbilt social worker in the emergency department, spoke with [Petitioner] and the male who accompanied her to the hospital, who was identified to Ms. Libonn as the mother's brother, Jose Hurtado, also the victim's uncle. Ms. Libonn's notes indicated that she was being assisted by an interpreter, a Mr. Gregory Garcia. The uncle reported to her the following:

> [T]he child and the mother lived with him, and I don't know if it was his wife or significant other, but they were referred to as that child's aunt. . . . [T]hey noticed that the child's head was swelling on that Sunday, and I don't have that date. It was unclear to me at that time, from what he was telling me, if medical attention had been sought at that time when they noticed the swelling.

> The uncle reported that they were sent by the child's pediatrician to the Radiology Department at Vanderbilt this afternoon for further testing.

The mother stated to Ms. Libonn that the child did not attend daycare, that she was the child's primary caregiver, and that the child was sometimes in the care of his grandmother.

Thereafter, according to Ms. Libonn's documentation, "the medical team from the emergency room came and explained to the mother and to the uncle that they had found some additional injuries" and that the Department of Children's Services would be contacted. [Petitioner] was

unable to provide any explanation to Ms. Libonn for any of the victim's various fractures.

Both Dr. Bracikowski and Ms. Libonn stated that, if a child presented to the hospital with head swelling, it was not emergency department protocol to refuse to treat that child. Such a practice would expose the hospital to potential liability.

Because child abuse was suspected, a "CARE Team" assessment was ordered. Dr. Kecia Nicole Carroll, a Vanderbilt pediatrician, spoke to [Petitioner] on Wednesday, November 11, with the assistance of an interpreter; no other family members were present. [Petitioner] provided the following explanations of the victim's injuries to Dr. Carroll:

Regarding fracture of [left] humerus:

> MOC reports [the victim] was doing well until approximately [two] weeks ago Tuesday at about 11 in the morning. MOC reports she was outside of their home with [the victim] and he was playing. MOC reports through interpreter "He was wanting to walk and he went to fall, and before he fell he put his arms in front."
>
> When I asked where he was outside, MOC reported "outside by a step with me. By the step of the apartment." When I asked MOC to tell me more about the fall, MOC reported through the interpreter "He had toys he wanted to grab and before he did it he fell." When I asked what he fell on, MOC reported "He fell on the pavement." When I asked what he was standing on, MOC reported "He was not standing on anything." When I asked how he acted after the fall, MOC reported "He did not cry or anything. I didn't notice until the next day that he could not move his arm." When I asked how he was during the rest of the day, MOC replied, "He was fine, like always, playing." When I asked if he was eating okay and moving arms and legs okay, MOC replied, "Yes, he was moving them but he could not turn his arm."
>  . . . .

Regarding cephalohematoma [scalp swelling]:

> MOC reported through interpreter, "Sunday I noticed that the right side of his head was inflamed. I called Monday and they said they did not have appointments. Called Tuesday and they gave me an appointment today."

When I asked MOC how [the victim's] head got hurt, MOC replied "On Sunday, he does not like to take a shower, when he was about to take a shower he started running and he hit his head on the wall." "After that he was fine like always." When I asked if he had any crying, vomiting, or [decreased] alertness, MOC replied no except "on Tuesday he took some milk and threw up at night."

When I asked about what time [the victim] hit his head on the wall, MOC reported, about 6:00 o'clock at night on Sunday.

When I asked how MOC had come to first notice his head swelling, MOC reported "Well, my brother noticed it. He felt his head and said it was swollen." When asked what time it was that MOC's brother noted swelling, MOC replied about "11 at night. He plays with [the victim] when he comes home from work."

When asked if [the victim] had been alone with anyone else on Saturday or Sunday, MO[C] reported he was always with her. MO[C] denied that [the victim] was out of MOC's care.

When asked, MOC reported that [the victim] did not have any other known trauma, falls, or car accidents. MOC reported that [the victim] did not have any other history of having broken bones or having been in a cast.

Dr. Carroll stated that [Petitioner's] explanation for the left humerus fracture was inconsistent with the nature and severity of the injury. Dr. Carroll believed that the victim would be in pain after fracturing his arm in this way, which would have continued until the arm was immobilized, and that the victim would have been unable to use his arm "normally after the injury[.]" If the injury occurred the day before taking the victim to the hospital, and the victim was not seen at Southern Hills until 2:00 p.m. the next day, Dr. Carroll opined, "Well, if a child had a fall, seeking medical care immediately is typical after an accident. When there is a delay in care, that is concerning that it was non-accidental injury."

According to Dr. Carroll, in addition to the cephalohematoma, the X-rays showed that the victim suffered an epidural hemorrhage in his brain; however, a follow-up MRI did not reveal a brain clot. The victim was placed under observation. Dr. Carroll did not believe that the running into a wall was a reasonable explanation for the skull fracture due to the severity of the injury. Also, according to Dr. Carroll, scalp swelling

would have "start[ed] soon after[ ]" the injury, not three or four days later. [Petitioner] never provided any explanation regarding the ulna or tibia fractures to Dr. Carroll. Dr. Carroll opined that "it would be hard to imagine [one incident] that would explain all of" the victim's various fractures.

The social history provided [ ] to [Petitioner] to Dr. Carroll was as follows: "People living in the home: Mother; Jose Hurtado, uncle (mother's brother), 33 years; Janet Hurtado, Jose Hurtado's wife, 32 years; Daphne Hurtado, Jose Hurtado's daughter, 14 years." [Petitioner] did not indicate any other occupants of the home and never mentioned a boyfriend by the name of Vicente Gonzalez.

Dr. Carroll was "very concern[ed]" that the injuries were "non-accidental" given the number of fractures, a history that was insufficient to explain their cause, and the different ages of the injuries. Dr. Carroll asked [Petitioner] if the victim "had been alone with anyone on Saturday or Sunday" when the victim sustained the head injury. [Petitioner] reported that the victim "was always with her" and "denied that [the victim] had been out of [her] care." Also, the victim was "developing normal[ly,]" had no bone disease predisposing him to fractures, and was a happy, playful child, according to Dr. Carroll. He also did not have any additional bruises or marks other than at the fracture areas. After finishing her assessment, Dr. Carroll recommended that DCS continue to investigate, and the victim was placed in DCS custody.

Around 8:30 on the evening of November 11, Detective Don Long with the Metro Police Department Youth Services Division also spoke with [Petitioner] and Mr. Gonzalez, who still identified himself as Jose Hurtado, in Vanderbilt's Emergency Department. He documented that he was assisted by a translator, Mr. Gregory Garcia, in interviewing [Petitioner]. [Petitioner] appeared to understand what was going on and responded appropriately to Det. Long's questions. He believed that "the other gentleman [in the victim's room] ended up speaking English."

Det. Long asked [Petitioner] about the victim's injuries, if there was "anything she could think of that could have happened to this child," and [Petitioner] explained, "about three weeks ago that she was at her mother's house, [and the victim had] fallen off her mother's bed." [Petitioner] stated that the victim was crying but did not mention any other change in his mental status, as might occur with a head injury. Det. Long later asked [Petitioner] about the prior humerus fracture, and [Petitioner] stated that the victim "fell off outstretched arm down from

- 10 -

one step." [Petitioner] told Det. Long that she was always present with the child. Det. Long did not observe any physical signs of abuse upon his visual examination of the child; however, he had investigated cases of "non-accidental trauma with fracture injures where there [were] no outward signs of trauma[.]" Following Det. Long's interview of [Petitioner], he was advised by the translator that [Petitioner] had provided conflicting accounts about the cause of the victim's injuries.

Det. Long also interviewed Mr. Gonzalez, with Ms. Rhodes present. Ms. Rhodes's report indicated the following took place during the interview:

> CM accompanied Detective Long as he interviewed alleged brother of [Petitioner], Mr. Vicente Gonzalez stated that his real name is not Jose Hurtado, and it was Vicente Gonzalez. He stated he wanted to apologize to CM Rhodes for not being truthful of his true identity. He stated that he was told to lie about who he really was because the grandmother, Maria Hurtado[ ] wanted to use him for insurance for the children and also afraid of [the victim's] being taken away from the family on 10/27/09 for the first DCS investigation where [the victim] was falling and hurting his left arm. Mr. Gonzalez stated that he does not know how the child obtained the injuries to his body. He stated that he leaves for work every day around 2:00 p.m, and returns home around 12:00 a.m. in the morning and goes to sleep. He stated that he worked for Standard Candy, but today was his last day. He stated that [Petitioner] has been his girlfriend for three weeks and now she is pregnant with [their] first child. He stated both [the victim] and [Petitioner] have been living with him. When he goes to work, [Petitioner's] family comes to his apartment, stays there all day, when he comes home, they would be gone. He stated that [Petitioner] always watches the baby and he has never seen her hurt the child and was very caring with [the victim]. He stated that [the victim] was like his child also and she is pregnant with his child now. He stated that he did not want to get in trouble with the police and that was very serious of [the victim's] being hurt. He stated that [Petitioner] has a real brother named Jose Hurtado.

According to Det. Long, Mr. Gonzalez expressed concern about [Petitioner's] telling him lies on prior occasions, and Mr. Gonzalez came forward to tell the truth in an effort to avoid trouble with the police.

Gregory Garcia, a medical interpreter for Vanderbilt Hospital, testified that he recalled translating on November 11, 2009, for the "team" in an

effort to facilitate conversations with [Petitioner] while inside the victim's hospital room. He stated that he did not "have any difficulties in translating or communicating" that day. He could not recall specifically whether he was involved in a conversation with a police officer and [Petitioner]. He did recall alerting someone to the fact that the mother had provided different stories for the child's injuries. He also recalled that a "mid-20s" male was present with the mother at the hospital, who appeared to be "a relative of the mother" at that time.

The victim again came to Dr. Green's office on November 30, 2009, and "the [left humerus] fracture was healed[.]" However, during this visit, Dr. Green "realized that the child had been seen in the emergency room on the 1[1]th of November because of a complaint of swelling in the head - on the head. He was X-rayed and the child had a skull fracture." Dr. Green also reviewed the skeletal survey of the victim performed on November 11. He observed a skull fracture "towards the back of the head." This fracture was "bilateral[,]" meaning it was "present on both sides of his head." Dr. Green opined that it would have taken a "fairly significant blow" to have caused this injury. Dr. Green stated that the fracture had "crossed over . . . a suture line[,]" indicating that it was "more likely . . . a fairly significant" and "non-accidental injury." The emergency room note indicated that the victim was brought in that day due to "scalp swelling" in the area of the fracture, indicating to Dr. Green that the skull fracture was "[m]ore recent."

Dr. Green further determined that the victim had two additional fractures on the November 11 X-rays - one of the right ulna, a bone in the forearm, and the other of the left tibia, the "shin bone" in the lower leg. Dr. Green described these both as "healing fracture[s]." He further opined,

It also appeared to me in looking at the X-rays that the ulna fracture was older than the tibia, the leg fracture, because there was more healing on the ulna fracture. I also looked at the skull fracture, which was brand new and acute, but we had a child who had . . . fractures . . . that occurred at different times.

Dr. Green elaborated, "It is exceedingly common . . . to see fractures in children that don't show up initially but will eventually once we start seeing healing." Also, the victim did not have any type of disorder or anything else that made him prone to fracture injuries, according to Dr. Green.

- 12 -

Dr. Green stated that the tibia fracture was "less than two weeks old" "because it takes seven days at minimum, seven to ten days, in a child of this age for the X-ray to show the fracture, show the healing." Dr. Green opined that this injury to the victim's left tibia "would have [had] to occur by a separate mechanism from any of the other fractures that [were] identified in the child's body[.]" If he had performed a skeletal survey on October 28, he likely would not have seen this injury because "the fracture [did] not look as though it . . . had enough healing . . . to be able to be seen" on an X-ray at that time.

Dr. Green then testified about the right ulna fracture, stating that this fracture was "older than the healing" seen in the tibia fracture and, thus, "occurred at an earlier time." He opined that this fracture was "more than two weeks old" and, again, that this injury occurred "by a separate mechanism from the other fractures in the child's body." It was possible that the fracture could have been seen on a skeletal survey, if one had been conducted on the victim on October 28.

Dr. Green was asked about whether the victim would have suffered pain from these three fractures to the skull, the tibia, and the ulna, to which he replied, "Absolutely, it would have hurt." He further stated that "a caretaker [would] be aware that something had occurred to cause that child to be in pain[.]" He stated, to a reasonable degree of medical certainty, that all four of these fractures were the result of non-accidental trauma, basing this diagnosis on the following:

> The child was only [thirteen] months of age and would not have been able to sustain these injuries on his own, and the skull fracture was the result of significant force. Our diagnosis for non-accidental trauma is the age of the child, and this child fits the age group, and fractures that occurred at different times. So this child had . . . four fractures that had occurred at different times, and that make[s] the diagnosis of non-accidental trauma.

He acknowledged that he was revising his previous opinion of the fracture to the left humerus made following the October 28 visit. Lastly, he stated that explanations offered by [Petitioner] - that the child had fallen off of a couch onto a floor, had run into a wall and struck his head, or had fallen off of a bed onto a floor - were not sufficient to explain the skull fracture that occurred to the victim.

On cross-examination, Dr. Green was asked about another explanation given by [Petitioner] for the skull fracture: "that the child had fell out of

- 13 -

a walker onto a glass table, striking his head, and tumbling down and hitting the leg of that table - he fell and hit his head first, and then tumbled down and hit his head[.]" Dr. Green responded that the fracture was "probably not the result of a simple fall, even a fall from a small height."

On October 28, Dr. Green did not observe any bruises or additional marks on the victim, other than the swelling associated with the humerus fracture. He appeared "healthy" and "well-nourished[.]"

Members of [Petitioner's] family and Mr. Gonzalez were also called as part of the State's case-in-chief. The real Jose Hurtado, the victim's uncle, testified that his sister never lived with him in 2009, that he was not present at Southern Hills Hospital on October 27, 2009, that he never went to Vanderbilt Children's Hospital while the victim was hospitalized in November 2009, and that he never had any conversations with doctors, hospital personnel, social workers, or police about the victim's injuries. Jose was not aware of the victim's injuries until later, and the child always appeared "very healthy" and had "a lot of energy," according to Jose. Jose further testified that the victim lived with another brother following his release from Vanderbilt in November 2009, and to Jose's knowledge he had not suffered any additional fractures since that time.

Jose stated that he and his family members were "very close," interacting with one another frequently. The victim was sometimes "taken away ... for a couple of days" to spend time with his grandmother; Jose said the victim was sometimes in the care of him and his wife; and the family visited Chuck E. Cheese entertainment center on occasion, the victim included. However, Jose could not report that the victim sustained any serious injuries while in [the] care of anyone other than [Petitioner]. According to Jose, [Petitioner] and Mr. Gonzalez were still having a romantic relationship, despite [Petitioner's] incarceration. He did not think his sister was "an abusive person to her child" and believed that his sister was the type of person to seek immediate medical attention if the victim suffered a serious injury.

Maria Hurtado, [Petitioner's] mother and the victim's grandmother, testified that she sometimes took care of the victim for [Petitioner], whom she described as "very active." However, she could not recall any injuries to the victim while in her care. Maria testified that she never told Mr. Gonzalez or her daughter to lie about Mr. Gonzalez's identity at the hospital. According to Maria, [Petitioner] still received mail at her

- 14 -

residence, although she no longer lived there. Maria stated that Alexis Vasquez, [Petitioner's] young nephew, interpreted during the interview with Ms. Rhodes, and that he did so at Ms. Rhodes's request "because nobody there spoke English." However, according to Maria, Alexis was not very fluent himself in English. She believed her daughter was "innocent[,]" that any injury to the victim was an accident. Maria also testified that the victim was in the care of other family members "from time to time" for outings, such as to Chuck E. Cheese.

Vicente Gonzalez testified and gave a much different account than that previously provided by the social workers, hospital staff, police, and doctors. Regarding the victim's arm injury, Mr. Gonzalez testified that the victim could not "lift his arm" on the morning of October 27, 2009. According to Mr. Gonzalez, [Petitioner] did not mention any problem with the arm before going to bed on the prior evening, and the victim "was perfectly fine" when he left for work early the next morning. When Mr. Gonzalez returned home from work, [Petitioner] told him "the baby was starting to walk and that he slipped and fell on top of his arm outside the apartment." They went to the hospital shortly thereafter, taking time only to change the victim's clothes before getting in the car.

They arrived at Southern Hills Hospital around 2:00 p.m. in the afternoon, and this visit lasted about six hours, according to Mr. Gonzalez. Mr. Gonzalez stated that the medical personnel at Southern Hills gave the victim some medicine, put a sling around the victim's arm, and sent them home. He stated that neither he nor [Petitioner] were told during this visit that the victim's arm was in fact fractured.

According to Mr. Gonzalez, he did not speak English very well, and [Petitioner] only spoke Spanish. Mr. Gonzalez was asked about a Southern Hills Hospital record that indicated that the victim "woke up that morning not able to use his arm" but did not mention anything about the victim "falling with his arm out outside the house that day[.]" He could not provide an explanation other than his inability to speak English well.

Mr. Gonzalez confirmed that Ms. Rhodes came to his house the following the day and interviewed them for approximately fifteen to twenty minutes, investigating about possible child abuse. According to Mr. Gonzalez, [Petitioner's] young nephew translated during the interview with Ms. Rhodes. Mr. Gonzalez said that he did not tell Ms. Rhodes that he was [Petitioner's] brother, Jose Hurtado, and if she said otherwise, then she was mistaken due to the translation. Also according

- 15 -

to Mr. Gonzalez, Ms. Rhodes never told them that the victim's arm was fractured.

Following Ms. Rhodes's visit, the couple took the victim to Vanderbilt Children's Hospital for further treatment. According to Mr. Gonzalez, the couple was "already planning on going" to Vanderbilt before Ms. Rhodes arrived because "[i]t just didn't seem like it was enough what [Southern Hills] had done for him there[.]" Ms. Rhodes followed them to Vanderbilt "to make sure everything was all right." Mr. Gonzalez testified that he was with [Petitioner] during the entire trip to Vanderbilt, that he never advised anyone he was the victim's uncle, and that other family members were present at the hospital that day.

Mr. Gonzalez stated that they were finally informed of the arm fracture once at Vanderbilt and that [Petitioner] explained to the doctor that the injury occurred when the victim "had fallen while walking and put his arms out[.]" Mr. Gonzalez was specifically asked, "Did you do anything to cause that fracture to [the victim's] left arm?" He replied that it was "impossible" because he was at work and further confirmed that [Petitioner] had always said she was present when that injury occurred.

Mr. Gonzalez was then asked about the victim's head injury. According to Mr. Gonzalez he first felt "a little bump on his [victim's] head" one day in November when he returned home from work. He said that they took the victim to Vanderbilt Emergency Room "immediately[,]" that they were informed of the head injury and swelling, but that Vanderbilt refused to see the child because he "looked fine" and already had "an appointment scheduled for a physical." Mr. Gonzalez stated that it was at least two more days before the victim saw a doctor.

Mr. Gonzalez described how the head injury occurred: "Well, what happened was one time we left him on this little walking contraption that he has, and she went to get the milk bottle and - but I didn't know he could get out of that thing, and he got on the sofa and then fell." According to Mr. Gonzalez, neither he nor [Petitioner] actually saw the victim fall; they "just heard him crying." Mr. Gonzalez described, "[The victim] wasn't a rambunctious run-around and climb all over the place kind of kid in November of 2009[.]" Mr. Gonzalez said that it was "three or four days" following this fall before he felt any swelling on the victim's head. Once admitted to the hospital, DCS came and took the child, and they were never informed of the victim's skull fracture. They hired an attorney the next day, who then informed them of the fracture.

Mr. Gonzalez denied that he told Alissa Libonn that he was Jose Hurtado. He did not dispute that the couple did not provide any explanation for the victim's injuries to Ms. Libonn.

When asked about [Petitioner's] statement that this happened when the victim ran into a wall, Mr. Gonzalez clarified that [Petitioner] stated that the injury "probably" could have happened that way and agreed that the victim often would "get mad and would throw himself backwards" hitting a wall, this occurring during the relevant time period. Also, [Petitioner] told Mr. Gonzalez that the victim had fallen off her mother's bed several weeks before when "he just threw himself backwards"; however, there was no injury from that incident according to Mr. Gonzalez.

Mr. Gonzalez was asked about his interview with Det. Long, and he denied many of the statements that were attributed to him during that interview - he never said he was Jose Hurtado and did not make any apology for misrepresenting himself as such, and he denied saying that no one else ever watched the victim or that [Petitioner] had "been lying to [him] on different occasions." He confirmed that he never told Det. Long about the victim's fall from the couch, explaining that he "didn't imagine it would cause something like that[.]"

On cross-examination, Mr. Gonzalez confirmed that he was at work during the humerus injury, and [Petitioner] called him and told him "that the child had fallen and hurt his arm" and needed to go to the hospital. [Petitioner] did not drive according to Mr. Gonzalez. He stated that they arrived at Southern Hills about one hour after [Petitioner] called him; he believed that they "acted as quickly as possible" to get medical treatment for the victim.

Mr. Gonzalez stated that there was no interpreter present at Southern Hills and that he communicated effectively enough to hospital personnel that day to inform them of how the child hurt his arm. He also stated that [Petitioner's] nephew continued to interpret for them with Ms. Rhodes after they arrived at Vanderbilt on November 11. He stated that Ms. Rhodes conducted her interview with both of them in the hallway of the hospital. He further claimed that "a lot of the time" there was no interpreter present at Vanderbilt and that he did the interpreting.

Mr. Gonzalez testified that he had never seen [Petitioner] commit any act of abuse against the victim and averred that she took good care of the victim. He further stated that [Petitioner] spent a lot of time with her

- 17 -

family, that the family was close, and that sometimes the victim's grandmother or aunts and uncles took him and cared for him.

Mr. Gonzalez stated that they were both present when the victim fell and hurt his head in the living room but that neither of them actually saw it because they were in the kitchen. [Petitioner] was preparing a bottle for the child, and he was sitting at the kitchen table. According to Mr. Gonzalez, this was the first time the victim had ever gotten out of the walker, and there was a glass table in the living room, which was "rather thick[.]" When the victim started to cry, [Petitioner] ran and picked him up to make sure he was okay. According to Mr. Gonzalez, the victim "cried a lot, but when she gave him the baby bottle[,] he calmed down." Mr. Gonzalez stated that there was "no blood, nor bruise, or like a bad bump" on the child's head, that "the child was normal [,]" and that they "had no reason to expect any serious head injury[.]"

He reiterated that it was "two or three days after the accident" before he noticed a bump on the child's head. According to Mr. Gonzalez, he made several calls to Vanderbilt "because when [he] went the first time they wouldn't see [him]," so "[he] called about four or five more times before they made an appointment for [him]." He stated that it took "three or four days" before they were seen by Vanderbilt, which accounted for the delay in treatment.

Finally, Mr. Gonzalez testified the he did not know about any of the other fractures or how they might have occurred. He further averred that the victim never cried "a lot" in his presence while holding his arm or leg.

At the conclusion of the State's proof, the State made the following election of offenses:

> Count one of the [i]ndictment alleges an act of aggravated child abuse committed against [the victim], (D.O.B. 9/8/08), and refers to the following conduct: the [D]efendant caused the spiral fracture to the left humerus of [the victim] on or about October 26, 2009.

> Count two of the [i]ndictment alleges an act of aggravated child abuse committed against [the victim], (D.O.B.9/8/08), and refers to the following conduct: the [D]efendant caused a fracture to the right ulna of [the victim] on a day in October 2009.

- 18 -

Count three of the [i]ndictment alleges an act of aggravated child abuse committed against [the victim], (D.O.B.9/8/08), and refers to the following conduct: the [D]efendant caused a fracture to the left tibia of [the victim] on a date in late October 2009 through November 4, 2009.

Count four of the [i]ndictment alleges an act of aggravated child abuse committed against [the victim], (D.O.B.9/8/08), and refers to the following conduct: the [D]efendant caused a bilateral skull fracture to [the victim] on or about November 8, 2009.

Count five of the [i]ndictment alleges an act of aggravated child neglect committed against [the victim], (D.O.B.9/8/08), and refers to the following conduct: the [D]efendant neglected the welfare of [the victim] on diverse dates between October 1, 2009 through November 11, 2009 resulting in multiple fractures injuries, an epidural bleed in his head, a cephalohematoma, and the [D]efendant delayed seeking medical attention for these injuries.

[Petitioner] then testified in her own defense. Prior to moving in with Mr. Gonzalez, she lived with her parents and received mail there, including information regarding the victim's insurance. According to [Petitioner], the victim was nine months old and had never had any health problems prior to moving in within Mr. Gonzalez in June 2009. She was eighteen years old at that time.

[Petitioner] testified that about a month after she moved in with Mr. Gonzalez, he began hitting her. He had also assaulted her at her parents' house when they were not home. The abuse began by Mr. Gonzalez's "squeezing" [Petitioner]'s arms "hard" and refusing to let go and escalated to his "hitting [her] with his fist in [her] face[,]" and throwing her against a wall while choking her "very tightly with his hand." The abuse left multiple injuries, according to [Petitioner]. During one episode, Mr. Gonzalez retrieved a knife and placed the knife in her hands, put his hands underneath hers, and said that the "only way that he would leave [her] alone" was for her to kill him. She stated that she received a "small" cut on this occasion.

[Petitioner] confirmed that she never reported any of the domestic abuse, although incidents happened daily "towards the end." She stated that she was afraid of Mr. Gonzalez, who had threatened to take the victim and return to Mexico. One time she threatened to leave Mr. Gonzalez, he took her phone from her so that she could not call any of her relatives

anymore. She was able to tell her sister-in-law, Jeannette Castro, about the abuse, calling her sometimes during the abuse.

When asked how Mr. Gonzalez treated the victim, [Petitioner] said that sometimes Mr. Gonzalez "would play very roughly" with him. She elaborated, "He would grab him by the head and pick him up, he would grab by the arms and pull him by the arms. And other times he would turn him over, he would grab him by his legs and pull him by the legs." She protested to this rough play, which happened several times; however, she never observed Mr. Gonzalez hit the victim "out of anger[.]"

According to [Petitioner], on the day prior to taking the victim to Southern Hills, where the left humerus fracture was discovered, she saw Mr. Gonzalez "playing with him and he was lifting [the victim] from his arms." She described, "He picked him up by both arms" and "jerked him up[,]" lifting the child over his head. [Petitioner] said that the victim did not cry from this but instead "kept on playing." She stated that she followed her regular routine until the following morning when the victim awoke and "couldn't lift his arm." Using her cell phone, [Petitioner] called Mr. Gonzalez, who was at work, and they went to Southern Hills hospital when he got home that day; all of which took about an hour, according to [Petitioner]. She confirmed that she lied at Southern Hills about the cause of the victim's injury and stated that she did so because Mr. Gonzalez, whom she feared, had told her to say the victim fell on his outstretched arm.

When Ms. Rhodes arrived at [Petitioner's] home the following day, her nephew, Alexis, interpreted for her, although he did not speak English very well. [Petitioner] stated that they gave her parents' address at Southern Hills "because the medical care for [the victim] had the address of my parents." According to [Petitioner], questions were often repeated during this conversations with Ms. Rhodes.

Once at Vanderbilt on October 28, 2009, [Petitioner] claimed to repeat the same story to the medical professionals: "I had taken the boy out for a walk and he had fallen." Mr. Gonzalez was with her at the hospital that day and instructed her to continue with the initial story. [Petitioner] claimed that Alexis continued to interpret for her with Ms. Rhodes but agreed that an interpreter was present when she spoke with Dr. Green. According to [Petitioner], following the victim's examination on October 28, Dr. Green "explained to [her] what was wrong with the

child[,]" and Ms. Rhodes told them that they could go home, "that the doctor had said it was an accident."

[Petitioner] was then asked to explain how the victim injured his head. She replied,

> That day, Vicente arrived, it was 7:30 at night, I was waiting on him to get there so I could go in to bathe and he could stay with the child. Vicente got there and we had dinner together as always, and so then I told him, I said I was [going] to take a bath and for him to watch the child, he said all right. I was bathing when I heard a thump and I heard the baby cry. I came out - I stopped bathing and came out quickly because I wanted to know what had happened to the baby. When I got there, Vicente told me that he had gone to the room and that he had left the child on the love seat.
> . . . .
> He left the child on the love seat and the child had fallen from there. He told me that he had hit himself very hard on the table that's in front of the love seat. . . . He told me that he had gone to the room to get his cell phone quickly.

She described the victim as an "active child." [Petitioner] claimed that there were no "signs of any obvious injury" or she would have taken the victim to the hospital. [Petitioner] said that, after the fall, the victim was "crying a little bit[,]" she gave him a bottle, and "he calmed down." She believed that this head injury happened on Saturday, November 7.

The victim was "perfectly fine" throughout the evening following his fall, according to [Petitioner]. The next morning they followed their "normal routine[.]" Mr. Gonzalez first noticed a lump on the victim's head that Sunday night when he was "playing rough" with the child. She had asked him to stop, but at one point, she left and went into the kitchen, leaving the victim alone with Mr. Gonzalez. [Petitioner] testified that Mr. Gonzalez called Vanderbilt "but a lady there told him that she couldn't give him any information because he's not the father." [Petitioner] said that Mr. Gonzalez was lying when he testified that he took the victim immediately to Vanderbilt Emergency Department upon noticing the lump.

According to [Petitioner], she called Vanderbilt the following day, and "they told [her] they couldn't set up an appointment with [her] because [the victim] already had an appointment for his two-year exam." After one more day, she finally convinced someone at Vanderbilt to make her

an appointment. The appointment was one more day after that, on Wednesday, November 11, and she kept that appointment. Mr. Gonzalez accompanied her and again instructed her on what to say to hospital personnel. According to [Petitioner], Mr. Gonzalez told her "to say that the boy had fallen from the walker and that he had hurt himself with the table." She confirmed that the true story was the one she provided earlier in her testimony, that the child fell off the love seat. When DCS came to take her child, she did not speak up because she was fearful of Mr. Gonzalez.

Finally, [Petitioner] confirmed that the victim was frequently cared for by members of her family. However, she agreed that she was never informed of any injuries while the victim was in their care, only things like "he would throw himself backwards" during a fit. She also averred that the victim was never injured in her presence and that she never failed to seek treatment for any type of injury. She confirmed that the victim had not received any additional injuries since being removed from her care.

On cross-examination, [Petitioner] testified that, since November 2009, when the victim was removed from her custody, and until April 2011, when she was arrested on these charges, she continued to live with Mr. Gonzalez. He continued to beat [her], and she remained in fear. When asked where would she live if she regained custody of the victim, [Petitioner] stated that she did not "think" she would move back to Mr. Gonzalez's home, that she wanted to return to her parents' home. However, she then confirmed that, during her incarceration, she had reconciled with Mr. Gonzalez, whom she loved, and that he had visited her around fifty times and that they had possibly spoken "[h]undreds of times" on the telephone.

She acknowledged that she never came forward with these allegations about Mr. Gonzalez until mid-way through trial. She agreed that she frequently lied, including saying that Mr. Gonzalez was Jose Hurtado, but again claimed that she only did so because of her fear of Mr. Gonzalez. [Petitioner] agreed that, by covering for Mr. Gonzalez in October, she allowed her son to be returned home with her and Mr. Gonzalez, even though she could have protected him by being truthful and allowing DCS to remove him then. Stated another way, [Petitioner] acknowledged that by lying she "put [her] son in harm's way again[.]"

[Petitioner] testified that Mr. Gonzalez began assaulting her about a month before she moved in with him. [Petitioner] claimed that, when

- 22 -

she stayed at the home of her parents, who spent a large amount of time in Mexico, her sister Christina saw bruises that were inflicted by Mr. Gonzalez. She confirmed that, despite this violence, she moved in with Mr. Gonzalez anyway. According to [Petitioner], Mr. Gonzalez threatened that, if she did not move in, then he would take her child from her. However, she was in fact fearful that he may start hitting the child once they lived together. [Petitioner] admitted that she stopped seeing the victim's biological father when he threatened to take the victim from her to Mexico. Also, [Petitioner] stated that Mr. Gonzalez hit her once in front of the victim.

[Petitioner] testified that her son had a high tolerance for pain. When asked how the victim received the additional fractures, [Petitioner] stated, "When one time when Vicente would grab him by his feet and he would be shaking him very hard." She claimed that the victim never limped. [Petitioner] denied ever hurting her son in any way. She confirmed that Mr. Gonzalez had not been charged with any of these crimes.

On redirect, [Petitioner] confirmed her belief that Mr. Gonzalez never intentionally hurt the victim. She hoped that he would have stopped playing rough with the child.

Sergio Hurtado, [Petitioner's] brother, testified that he and his wife had custody of the victim for almost three years by the time of trial, and he described the victim as a "very hyperactive child." The victim had not developed any additional injuries after being removed from [Petitioner's] care and placed with Sergio.

According to Sergio, when [Petitioner] had custody of the victim, the family regularly visited one another, and they often took the victim on outings. Sergio said that [Petitioner] "was always [a] very good mother" and that he allowed [Petitioner] to care for his daughter while he was at work. Sergio never observed any problems with the victim prior to [Petitioner's] moving in with Mr. Gonzalez.

Sergio's wife, Francisca Angel-Espindola, described the victim as "a very playful child, very naughty." She confirmed that the family was close and that they took the victim on outings when he lived with [Petitioner]. Ms. Espindola agreed that [Petitioner] was "a good mother[.]"

- 23 -

Ms. Espindola worked with [Petitioner] at Standard Candy Company. After [Petitioner] moved in with Mr. Gonzalez, she noticed that [Petitioner] became a "loner" while at work. Both Ms. Espindola and Sergio noticed a personality change in [Petitioner] during this time frame. According to Ms. Espindola, Mr. Gonzalez controlled [Petitioner's] money, and on one occasion, she witnessed a phone call between [Petitioner] and Mr. Gonzalez, when Mr. Gonzalez was verbally abusive to [Petitioner]. Ms. Espindola also saw bruises on [Petitioner's] hands one day at work, but this was after the victim had been removed from [Petitioner's] care.

Alexis Vasquez testified that he interpreted for a DCS case worker in October 2009 and that he was twelve or thirteen years old at the time. According to Alexis, he interpreted for the case worker both at [Petitioner's] home and at Vanderbilt. He stated that he had only been in this country for about three years and did not speak English well at that particular time. Alexis admitted that he gave different answers than these a week before when asked by the assistant district attorney general.

Jeannette Castro, Jose Hurtado's wife and [Petitioner's] sister-in-law, testified that the family was very close and spent frequent amounts of time together. She also described the victim as "very hyperactive." According to Ms. Castro, [Petitioner] provided good care for her son and often kept Ms. Castro's daughter. Although Ms. Castro never personally witnessed any domestic abuse, on multiple occasions, she went to pick up [Petitioner] after she had been abused by Mr. Gonzalez or kicked out of the house. Ms. Castro stated that she saw bruises on [Petitioner's] face, legs, and arms during these episodes. [Petitioner] mentioned Mr. Gonzalez's having a knife on one occasion, and according to Ms. Castro, [Petitioner] "was fearful" of Mr. Gonzalez. According to Ms. Castro, [Petitioner] was a "fun" and "happy person" prior to living with Mr. Gonzalez, and once [Petitioner] lived with Mr. Gonzalez, the family "hardly ever [saw] her." Ms. Castro said that, whenever Mr. Gonzalez was around the victim, the victim "totally changed."

On cross-examination, Ms. Castro acknowledged that she did not inform anyone of this abuse until after the State had closed its case-in-chief, when she called Ms. Menke around 8:45 in the evening. She also admitted that [Petitioner] never specifically told her that Mr. Gonzalez caused the victim's injuries; however, Ms. Castro asserted that she was "a hundred percent" sure that [Petitioner] was not the one who hurt the victim.

In rebuttal, the State called Emily Menke, a victim/witness coordinator for the district attorney general's office, who was assisting on this case because she spoke fluent Spanish. Ms. Menke confirmed that she received a call from Jeannette Castro following the close of the State's proof. Ms. Menke had also listened to recordings of conversations between [Petitioner] and Ms. Castro and also between [Petitioner] and Mr. Gonzalez. During the conversation with Mr. Gonzalez, the couple continued to express their affection for one another. There was also discussion to the "effect" that they would get back together, including with the victim, if [Petitioner] was acquitted of these charges. They never discussed any physical abuse during this call, and [Petitioner] never suggested that Mr. Gonzalez was responsible for the victim's injuries.

*State v. Angel Geovanna Hurtado*, No. M2014-00180-CCA-R3CD, 2014 WL 7417763, at \*1-16 (Tenn. Crim. App. Dec. 30, 2014).

*Post-Conviction Hearing*

Trial counsel testified that he had practiced law for more than forty years, and the last twenty years of his practice was primarily criminal law. He said that Petitioner was the primary caretaker for the victim, who was "12, 13 or so months-old" at the time of the offenses. Trial counsel noted that "what struck me about the injuries was the number of injuries on this child and the location of the injuries." He testified:

> There was one to the head, I think maybe two separate injuries to the head; arms, radius and ulna I think were fractured, then her [sic] lower leg. And as we got discovery, I noticed that some were old fractures that had healed on their own.
> .    .    .
> And some were healing, then we had the new one of which I think brought this to bare, the shoulder injury, shoulder or arm injury, and I believe during the course of treating the child for the shoulder or the arm injury, a skeletal x-ray - - sorry CT was taken of the child, that's when all of the other injuries were detected.

Trial counsel noted that the charges against Petitioner were very serious due to the age of the victim and the multiple injuries. Although Petitioner had no prior criminal record, she faced a lengthy sentence due to the seriousness of the offenses.

Trial counsel testified that the prosecutor assigned to Petitioner's case was not "the most reasonable person in the world[.]" Trial counsel said that he was "always looking for a way to resolve [Petitioner's case] out of court." He testified that there were multiple

discussion dates and pretrial motions. When asked if he received any settlement offers from the State in Petitioner's case, trial counsel testified:

> Well, there was several, but as I indicated to you a little earlier, it started out, in my recollection, real high, 20, 25 or so years, something like that, and I think you mentioned or asked me at least whether or not that was an offer of 12 years, it could have very well been, I cannot recall, I will be honest with you, but, you know, generally in these situation[s] we start out, at least the State will start out at a higher offer, and then you have to try and negotiate it down, so it could have very well been at a lower figure than that 20, 25 years.

Trial counsel specifically stated that he could not recall if there was an offer for twelve years at one-hundred percent. It was trial counsel's opinion that an offer of twelve years "would have been too high for a first offender, to persons who had no blemishes on her record or anything, I thought, and just to say this to you, I would have probably thought that's too high, we can do better."

Trial counsel testified that it was his practice to always convey a settlement offer to his client, and he would always counsel them as "best" he could. He noted that there was a language barrier in Petitioner's case; however, a certified interpreter from the court was always present when he spoke with Petitioner in court or at the Department of Correction. Trial counsel noted that Petitioner had a very large extended family, and he also spoke with them, with Petitioner's permission, candidly about the case. Trial counsel testified that he would have communicated the seriousness of the evidence in Petitioner's case. He said:

> Now I'm not saying per se the words, but I, probably because of the seriousness of the charges, I probably would have said look, being a number of charges here, they're very serious, and if she was to be found guilty, and normally in a situation like this I would say what it [sic] we are 50 percent able to get an acquittal, we still have an awful lot of time she's potentially looking at if she's found guilty, so that would have been the way I would have communicated that to him or her.

Trial counsel recalled that Petitioner was interested in a settlement offer. He said, "I believe [Petitioner] essentially left that up to me, the defense lawyer, yes, she wanted to settle, but to what extent, . . ., she was waiting for me to get back with her with something that I guess she found that she could live with." Trial counsel testified that he told Petitioner that it was ultimately her decision on whether or not to accept a plea offer. He thought that he and Petitioner had a conversation on the day of trial concerning the State's plea offer. However, trial counsel was not certain that he was able to effectively communicate everything to Petitioner because of the language barrier and due to her

- 26 -

"age, her experience, just a number of things, put it all together." He further said, "I have tried and given it everything that I, but, in hindsight, look back on it, I probably needed maybe a couple of days to fully get it engrained into her what was going on, what she was about to step into." Trial counsel admitted that during the year and a half that he represented Petitioner before trial, he communicated with Petitioner. He said, "Oh yea, we were communicating, but as we were going forward and the time became shorter, we were having to adjust to different ways of communicating what it would be about. Initially we had all this time, we got discussion dates and all that, there wasn't that sense of urgency or anything, so we were communicating, yes." Trial counsel testified that it got to the point where a decision had to be made.

Trial counsel testified that there was a lot of discovery in Petitioner's case including medical records. He did not recall if he gave Petitioner a copy of discovery, but he reviewed it with her through the interpreter. He also reviewed the statutes with Petitioner and attempted to explain the trial process to Petitioner.

Trial counsel thought that telephone calls were made to the State's witnesses that were providing expert medical testimony. He felt that he had a good understanding about the "mechanics" of the victim's injuries. Trial counsel recalled that one of the experts testified that the victim would have experienced "severe pain" after the injuries. Trial counsel thought that he "might have followed up on how long, why would there be severe pain and things like that[.]"

When asked why he did not call an expert witness for the defense, trial counsel testified:

> Like I told you in the beginning, we have multiple injuries, head, two fractures of the head, we have shoulder, we have arms, we have legs, one of the State's theor[ies] was that, I forgot what court it was, but they talk about a swirling of, whatever they call it twisting?
> . . . .
> Spiral. My expert would had to have had testified that a spiral injury existed, that would have all but sealed that count. Then we're talking about neglect, one thing we do know, that these injuries occurred at different times, different intervals, okay, a child, and some of them probably would have occurred before the 13-month period, some might have occurred 8 or 9 months, problem being with that, our expert would had to have noticed those injuries, so if the State's theory on abuse didn't happen, we would have sealed it for them on neglect.

Trial counsel specifically testified that he made a "judgment decision" not to call an expert witness. He noted that Petitioner had given at least four different accounts of how

the victim's injuries occurred.  Trial counsel testified that he would have called an expert "had it been one or two different injuries[.]"

Trial counsel agreed that he employed Thomas Mark Bullard, a physician's assistant, to review the medical evidence in Petitioner's case.  It was noted at trial that Mr. Bullard is now deceased.  Trial counsel, Mr. Bullard, and an interpreter visited Petitioner in May of 2012 to discuss Petitioner's account of what happened to the victim. He thought that he communicated to Petitioner that the victim's injuries appeared to be non-accidental, and there was a good chance that the jury would convict her based on the medical evidence.  Trial counsel testified that he would have based a "lot of [his] opinion on what [Mr. Bullard] told [him]."

Trial counsel testified that he would have never told Petitioner that he could beat a plea offer of twelve years at one-hundred percent.  He said, "I would say that I would try and get a better or lower offer, but I wouldn't say that I can beat, because I never say what I can do in a court."  Trial counsel also testified that he would never have given Petitioner or her family any assurances that he would be successful in reaching an acquittal at trial.  Trial counsel thought that he saw Petitioner every two to three weeks before trial, and he estimated that he visited her between seven and twelve times at the Department of Correction.

On cross-examination, trial counsel reiterated that he could not recall if the State made an offer of twelve years.  He further did not recall if the State rescinded any plea offers after the case was set for trial.  Trial counsel testified that he always left the decision whether or not to accept a plea offer up to his client.  When asked if it was Petitioner's decision to go to trial, trial counsel said:

> That is where I was trying on direct to make the point.  This young lady was in a situation where she had to make a quick decision and attempt to fully communicate through an interpreter, I'm going to have to be as honest as I can on this, I thought I was effective in informing her what was going on, what was going to happen and what she would have to do right now, as far as going to trial or not, and I believe the decision was, I hate to go back and try to and say specifically what happened, all I know is we were left with having to go to trial.
>
> *    *    *
>
> Left with having to go to trial.  I'm not going to say that she looked me in the eye and said, "No, I want to go to trial right now," because I can't remember.  All I can remember is that I attempted to say this is where we are and do you understand, and I would have said "Do you understand."  See I done [sic] found often time if you're not

communicating, especially with my Hispanic clients, they can shake their head, they can do things like this, but they don't have a clue. I'm not saying that happened here, but I'm just saying honestly I'm hopeful that I communicated effectively with her.

In his professional opinion, trial counsel believed that Petitioner understood her right to go to trial. Trial counsel also had a policy to ask a client, "Do you have any questions about what's going on," and he was certain that he did not fail to ask Petitioner that question. He said that Petitioner was able to ask questions, and her questions were "appropriate to the subject matter." Trial counsel testified that Petitioner "[m]ost definitely" made the decision to go to trial.

Concerning claims of domestic violence against the victim by her boyfriend, trial counsel testified:

Well, I initially I think that it did come up, the boyfriend was supposed to have done that, I would go a little further and state that he was going to even take the charge, and what developed as we got closer to trial and as I indicted what the potential penalties would be, all of that just fell through, so I got the impression from him that it did not happen. If that had been the case, I think it would he would have been at trial, he was not at the trial, we wouldn't have been able to utilize that.

Trial counsel did not believe that domestic violence was an appropriate defense in Petitioner's case. He did not recall if a duress instruction was given to the jury at the close of the trial. On re-cross examination, trial counsel agreed that there were jail calls presented between Petitioner and her boyfriend during which they spoke at length declaring their love for each other.

Trial counsel agreed that he made a strategic decision not to hire an expert in Petitioner's case. He felt that the expert would have "bolstered certain theories of the prosecution," and it "made no sense in hiring someone when obviously [he] saw all of these different fractures in different locations." Trial counsel further testified that the only thing an expert witness would have established "was that fractures existed, old healing fractures, fracture that was in the process of healing, new fractures, that's the only thin[g] he or she would have been able to do, and I didn't see the need to hire someone to tell me [what] was obvious." Trial counsel testified that his main contact with the Petitioner's family was her brother.

Petitioner testified that her family hired trial counsel to represent her after her arrest in May 2011. She said that trial counsel came every three weeks to four weeks to see her. Sometimes he did not have an interpreter with him. Petitioner said that she could not understand a lot of what trial counsel said when he did not have the interpreter

so he told her that he would come back with one. She did not receive a copy of discovery from trial counsel. When asked if trial counsel reviewed discovery with her, Petitioner testified: "He only explained to me the fractures that the boy had on his head, only about the fractures and that was it." She said that trial counsel explained the offenses that she was charged with, and he "always said that he was going to help me and that he got the case." Petitioner understood that to mean that trial counsel was going to "do everything he could to get me out of here[.]" Trial counsel told her that the State had to prove certain elements of the offense to convict her, but he did not specifically explain to her what the State had to prove beyond a reasonable doubt. Petitioner's testified that trial counsel told her that "they were worried, they were not worried about the bone fractures on the [victim's] arm, but they were worried about the bone fractures on the [victim's] head." Petitioner said that trial counsel did not explain what would happen to her if the jury convicted her.

Petitioner testified that she "really didn't know" that she was charged with five felonies, and trial counsel said something about "the 15 years, but he didn't say anything about the 20 years." She said that trial counsel told her about a plea offer of twelve years at one hundred percent and that he told her about the offer "around the third court date that [she] had." Petitioner testified that there was an interpreter present when trial counsel told her about the offer. She said, "I asked him he would [sic] recommend that I take it, and he said no, that was a long time for me since I didn't have a criminal record, ever."

When asked how trial counsel told her that he could "beat" the charges against her, Petitioner replied:

> He said that the boy didn't have any marks on his body, that nobody had found anything, that I got my family and my family knew that I was a good mother. I even think that my family gave him some videos about the boy so they could see how the boy was.

Petitioner testified that the victim was very rambunctious and had a lot of energy. She did not think that trial counsel presented any of that evidence to the jury. Petitioner testified that she spoke with Mr. Bullard and trial counsel about the victim's injuries. She said, "From what I understood from the doctor [Mr. Bullard], he showed me the x-rays for my boy from the arms, and he said that whatever he had on the - - on the tibia, anybody could do that with anything." Petitioner testified that trial counsel presented Mr. Bullard as someone who would be testifying on her behalf at trial, but he never showed up. Petitioner said that she thought Mr. Bullard was a doctor rather than a physician's assistant. She thought that trial counsel asked her parents for money to hire Mr. Bullard, but she could not remember for certain. Petitioner testified that she felt "safe" going to trial after speaking to Mr. Bullard.

- 30 -

Petitioner testified that she and trial counsel did not discuss her domestic situation. At the time of the offenses, she was living with her boyfriend Vicente Gonzalez. Because Petitioner's father's last name is also "Gonzalez," in order to avoid any confusion, we will refer to Petitioner's boyfriend as "Vincente." We intend no disrespect. She said that Vicente was abusive toward her, controlling, and manipulative. Petitioner also said that she was scared of Vicente; however, she continued to talk with him throughout the course of her incarceration and trial. She thought that her sister-in-law, Jeanette Castro, knew about the situation with Vicente. Petitioner did not know that Vicente would be called as a witness for the State. She thought that he was going to testify on her behalf.

Petitioner testified that at some point during the middle of trial, the State presented audio recordings between her and Vicente. On the fourth day of trial, trial counsel began asking her questions about domestic violence in the home. Petitioner testified that trial counsel told her that it was important for her to tell the truth about her relationship with Vicente. She felt that trial counsel should have found out more information about the domestic violence because she did not know that it was important to her case.

Petitioner did not feel that trial counsel did an appropriate job investigating her case, and communicating with her about the circumstances of her case. She thought that he needed to "find out more with the doctor as he said, check the videos that my family gave him, that's all he told me he had." Petitioner testified that she was twenty-years old at the time of trial, and she had a sixth grade education. She obtained her GED while in prison. Petitioner said that she did not understand the weight of the evidence against her, but she understood the trial procedure, the role of witnesses, and function of the jury. She "really" did not understand the role of the trial judge. Petitioner testified that trial counsel did not tell her that the State was trying to convict her of some very serious crimes and that some of her family members would be called to testify against her. She admitted that the domestic violence claims were new to trial counsel during the trial. Petitioner reiterated that she thought trial counsel was prepared for trial but now she realized that he was not prepared because "he never disclosed to me that [sic] gravity of the charges that I had." She was surprised that the jury found her guilty of all five charges because trial counsel always told her that "he was going to win."

On cross-examination, Petitioner testified that she met and spoke with trial counsel multiple times. She admitted that she never told trial counsel that she was abused by Vicente. Petitioner further admitted that she professed her love to Vicente during their phone calls while she was incarcerated, and he visited her forty-nine times in jail before trial.

Petitioner claimed that she did not realize how serious her charges were because Mr. Bullard told her that the victim had several fractures, "but that the fractures that he had on his hand and on his feet, that anybody could have done those to him or they could

have been done with whatever thing and he could have proven that." She agreed that fractures to a child's hands and feet are serious and that a skull fracture is serious. Petitioner testified that she did not cause any injuries to the victim. However, if trial counsel had explained that she would spend twenty-five years in prison, she would have accepted a plea agreement. Petitioner testified that trial counsel told her that he would be able to obtain a sentence lower than the plea offer of twelve years at one-hundred percent. She thought that the offer was made on the third or fourth court date. She did not remember any other plea offers. Petitioner testified that trial counsel told her that she would have to go to trial if she did not accept the State's plea offer. The choice was made to go to trial.

On redirect examination, Petitioner testified that trial counsel did not explain the theory of negligence, and he always told her that "the best thing was to go to trial." He never told her that pleading guilty might be in her best interest. Even though she did not injure the victim, Petitioner said that she would have pled guilty if she had understood the "weight of the State's evidence against [her]." She was aware that the State's doctors would testify that the victim's injuries were not accidental.

Pedro Hurtado Gonzalez, Petitioner's father, testified that he contacted trial counsel after Petitioner's arrest in 2011. He thought that he spoke with trial counsel every three to four days about Petitioner's case. Mr. Gonzalez testified that trial counsel never explained the seriousness of the charges against Petitioner. He said that trial counsel indicated that they were going to hire a doctor as an expert, but Mr. Gonzalez never met him. Mr. Gonzalez testified that he paid trial counsel $350 or $375 for the expert, and he expected an expert to testify on her behalf at trial.

Jose Hurtado, Petitioner's brother, testified that he helped interpret information between Petitioner's family and trial counsel. He said that trial counsel would meet with him and other family members to tell them what he thought about Petitioner's case. Mr. Hurtado testified that trial counsel was "going to grab a doctor to physically check on [the victim] and that he was going to charge something about 300, $350." He said that trial counsel led them to believe that the doctor would testify on Petitioner's behalf at trial. Mr. Hurtado testified that trial counsel never told them how serious the charges were against Petitioner. He said that trial counsel "said that they were offering [Petitioner] something between ten and twelve years, I really don't remember, and he said that that was ridiculous and that he was going to beat that case easily." Mr. Hurtado testified that trial counsel always said that everything was fine and going great. He said that he only learned before the post-conviction hearing that Petitioner was serving a twenty-five year sentence. Mr. Hurtado said that he and Petitioner's family thought that a twelve-year sentence was too long because the victim "didn't have anything[.]" He thought that Petitioner relied heavily on trial counsel and his opinion. Mr. Hurtado admitted that common sense told him that a twelve-year plea offer would indicate that the charges against Petitioner were serious, but he said that they trusted trial counsel.

Jeanette Castro, Petitioner's sister-in-law and Jose Hurtado's wife, testified that trial counsel asked the family for money to hire a doctor but they never saw one. Ms. Castro testified that she knew of the domestic violence between Petitioner and Vicente Gonzalez because she picked Petitioner "up at 2:00 in the morning every time he beat her up[.]" Ms. Castro said that she spoke with trial counsel about the domestic abuse before and during trial. She knew that Petitioner remained in contact with Vicente, and she told Petitioner to stop talking to him. Ms. Castro believed that Petitioner was being manipulated by Vicente, and Petitioner was fearful of him. When asked how trial counsel portrayed Petitioner's case, Ms. Castro testified:

> Not even once that I remember that he would say that the Court went wrong or that she didn't have any chances. Every time she called me and said "What did [trial counsel] say," I was like "Well he said everything was going great, that everything was fine," that she did not take any, you know, pled, is that how you call it, plead, you know, just keep on with the court and everything was going to be fine that all the blame was going to be on Vicente, and that she was innocent and nothing was gonna go wrong. So we, through the whole trial we always knew, even before the trial he said everything was fine.

Ms. Castro testified that trial counsel never explained the seriousness of the charges against Petitioner or the amount of time that she faced if convicted. She said that it never occurred to the family to ask about the consequences of the charges.

Ms. Castro testified that in the courtroom trial counsel discussed with Petitioner's family a plea offer by the State. She said,

> [H]e sat us all together and he said that, I think, I recall him saying something about an offer, but he said, "No, that is stupid," he said "Don't take it, we're gonna win this case," so we were like, okay, so we never even thought about. If we would have known, we would have talked to her or, you know, get another lawyer to help us out because we knew she was innocent, so we would try to help her, but the way he said it, we were like no, let's wait and see what happens.

Ms. Castro testified that trial counsel requested "like 300 or something" for an expert witness. She noted that Petitioner was twenty years old at the time of trial, and she "barely made it to middle school, I think." She did not think that Petitioner understood what was going on at the time of trial.

On cross-examination, Ms. Castro testified that she did not report any domestic violence incidents between Petitioner and Vicente to police. She said they all discussed it

as a family but did not call authorities. Ms. Castro said that it was up to Petitioner to call police. She testified that she took Petitioner into her house four times because of the abuse. Ms. Castro testified that the domestic violence incidents took place approximately five months before the victim was taken to the hospital. She said that she barely talked to Petitioner after the victim was taken to Vanderbilt Hospital. Ms. Castro testified that she only told Petitioner's parents about one incident of domestic violence. She was not aware that Petitioner's parents accompanied Vicente to visit Petitioner in prison at least seventeen times. Ms. Castro was not aware that Petitioner called Vicente from jail on several occasions professing her love for him.

Ms. Castro remembered trial counsel talking about a guilty plea offer. She did not think that twelve years was a long time to serve in prison and that Petitioner would have accepted that offer if trial counsel had told her that she faced twenty five years.

*Analysis*

Petitioner contends that trial counsel rendered ineffective assistance of counsel because trial counsel: (1) failed to call an expert witness at trial; (2) failed to properly investigate evidence of domestic violence between the victim and her boyfriend, Vicente Gonzalez; and (3) failed to effectively communicate the State's plea offer. Petitioner also asserts that the cumulative effects of trial counsel's errors "rendered the results of Petitioner's trial and appeal fundamentally unfair." However, we find that the evidence does not preponderate against the post-conviction court's findings that Petitioner received effective assistance of counsel.

To obtain post-conviction relief, a petitioner must prove that his or her conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the United States Constitution or the Tennessee Constitution. T.C.A. § 40-30-103; *Howell v. State*, 151 S.W.3d 450, 460 (Tenn. 2004). A post-conviction petitioner bears the burden of proving his or her allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). In an appeal of a court's decision resolving a petition for post-conviction relief, the court's findings of fact "will not be disturbed unless the evidence contained in the record preponderates against them." *Frazier v. State*, 303 S.W.3d 674, 679 (Tenn. 2010).

A petitioner has a right to "reasonably effective" assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). The right to effective assistance of counsel is inherent in these provisions. *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *Dellinger*, 279 S.W.3d at 293. To prove ineffective

assistance of counsel, a petitioner must prove both deficient performance and prejudice to the defense. *Strickland*, 466 U.S. at 687. Failure to satisfy either prong results in the denial of relief. *Id.* at 697.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, *see Strickland*, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. *See Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

First, Petitioner contends that trial counsel was ineffective for failing to hire an expert witness in the field of pediatric orthopedics to testify concerning the victim's injuries. However, Petitioner did not present the testimony of any expert witness at the post-conviction hearing. In cases where a petitioner contends that trial counsel failed to present a witness in support of the petitioner's defense, the petitioner should present such witness at the post-conviction hearing. *Black v. State,* 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Neither a trial nor an appellate judge can speculate as to whether that witness's testimony would have been favorable to the defense. *Id.* Therefore, the petitioner should "produce a material witness who . . . would have testified favorably in support of his defense if called [at trial]. Otherwise, the petitioner fails to establish the prejudice requirement mandated by *Strickland v. Washington*." *Id.* at 758. Because no expert witness testified at the post-conviction hearing, the Petitioner has failed to show that she was prejudiced by trial counsel's decision to not call an expert witness at trial. *See id.* at 757-58.

We also note that trial counsel employed Thomas Mark Bullard, a physician's assistant, to review the medical evidence in Petitioner's case. Trial counsel, Mr. Bullard, and an interpreter visited Petitioner in May of 2012 to discuss Petitioner's account of what happened to the victim. Trial counsel agreed that he made a strategic decision not to call an expert in Petitioner's case. He felt that the expert would have "bolstered certain theories of the prosecution," and it "made no sense in hiring someone when obviously [he] saw all of these different fractures in different locations." Trial counsel further testified that the only thing an expert witness would have established "was that fractures existed, old healing fractures, fracture that was in the process of healing, new fractures, that's the only thin[g] he or she would have been able to do, and I didn't see the need to

hire someone to tell me [what] was obvious." Petitioner is not entitled to relief on this ground.

Next, Petitioner contends that trial counsel failed to "make proper investigation and trial preparations for the issues of domestic violence presented at trial." Concerning this issue, the post-conviction concluded:

> The decision not to introduce domestic violence evidence at trial was a strategic one based on reasonable investigative efforts by trial counsel. Petitioner testified that she never told trial [counsel] about the existence of any domestic violence. Trial counsel's knowledge of any claim of domestic violence came solely from Petitioner's sister-in-law, Ms. Castro but not until the trial had begun. Further, trial counsel possessed an audio recording of Petitioner and her boyfriend expressing a desire to be together and a jail log showing that Petitioner's boyfriend visited her 49 times in jail. Additionally, Petitioner never called the police to report domestic violence between her and her boyfriend. Finally, the State possessed an audio recording wherein Petitioner told her boyfriend she loved him and did not seem fearful of him.

> Trial counsel decided to forego a domestic violence defense only after learning of the above information. He made the strategic decision that domestic violence was not a viable defense, and he was not deficient in this area. *Id*.

The record supports the post-conviction court's conclusion. Concerning claims of domestic violence against the victim by her boyfriend, trial counsel testified that he "got the impression" from Vicente that the domestic abuse did not happen. Trial counsel also did not believe that domestic violence was an appropriate defense in Petitioner's case. Trial counsel noted that there were jail calls presented between Petitioner and Vicente during which they spoke at length declaring their love for each other, and Vicente visited her 49 times in jail. At trial, Petitioner admitted that she reconciled with Vicente, whom she loved, during her incarceration and that he had "visited her around fifty times and that they had possibly spoken '[h]undreds of times' on the telephone." *Hurtado*, 2014 WL 7417763 at *15. Petitioner admitted at the post-conviction hearing that she never told trial counsel that she was abused by Vicente, and he learned about the abuse from Ms. Castro. Ms. Castro admitted that although she and other family members knew about the abuse, they never called police. Therefore, trial counsel's performance was not deficient in this area.

Moreover, as pointed out by the State, Petitioner has not shown prejudice concerning this issue. Petitioner testified at trial that Vicente was abusive toward her, and she detailed alleged incidents of abuse by him toward her. Petitioner also testified

that Vicente would play roughly with the victim and that prior to the discovery of a fracture of the victim's left humerus, she had seen Vicente "playing with him and he was lifting [the victim] from his arms." Petitioner further described that Vicente picked the victim "up by both arms" and "jerked him up[.]" Petitioner also testified that the victim's head injury occurred while Vicente was watching the child so that she could take a bath. The jury heard testimony concerning alleged domestic violence against Petitioner and the victim by Vicente Gonzalez but chose to convict her of aggravated child abuse, child neglect, and reckless aggravated assault. Petitioner is not entitled to relief on this ground.

Thirdly, Petitioner argues that trial counsel was ineffective in the "plea negotiation process."

> The right to effective assistance of counsel applies in all critical stages of the criminal process, including plea negotiations. *Nesbit v. State*, 452 S.W.3d 779, 787 (Tenn. 2014). An attorney is required to "explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Tenn. Sup. Ct. R. 8, RPC 1.4(b). When considering a plea, "counsel must advise the accused, among other things, of the choices that are available to him as well as the probable outcome of these choices." *Parham v. State*, 885 S.W.2d 375, 384 (Tenn. Crim. App. 1994) (footnotes omitted); *see* American Bar Association Standards for Criminal Justice 14 - 3.2 ("To aid [Petitioner] in reaching a decision, defense counsel, after appropriate investigation, should advise [Petitioner] of the alternatives available and address considerations deemed important by defense counsel or [Petitioner] in reaching a decision."). An attorney, after providing "'competent and fully informed advice, including an analysis of the risks that the client would face in proceeding to trial,'" must abide by the accused's decision to either accept or reject a plea. *Nesbit*, 452 S.W.3d at 787 (quoting *Burt v. Titlow*, 571 U.S. 12, 25 (2013) (Sotomayor, J., concurring)).

*Stephanie Ann Cole v. State*, No. E201702036CCAR3PC, 2018 WL 3409237, at *6 (Tenn. Crim. App. July 12, 2018)

Concerning this issue, the trial court concluded:

> Petitioner testified that trial counsel conveyed the 12-year plea offer to her. In fact, every member of Petitioner's family that testified at the hearing admitted that trial counsel told them about the 12-year offer. Petitioner further testified that she understood the trial procedures and the role of the jury, and, despite the fact she thought the injuries could be "explained away," she understood the severity of the victim's injuries. Petitioner contradicted herself several times when asked if she

- 37 -

understood about [ ] the nature of her charges, and overall did not carry much credibility in this area.

Conversely, trial counsel's strategy from the beginning of the case was to resolve the case without going to trial because of the nature of the injuries to the victim. Although trial counsel felt they could get a better offer, he still communicated the 12-year offer to Petitioner and explained the nature of the offer to her. Admittedly, trial [counsel] expressed concerns about his effectiveness in communicating the plea offer to Petitioner, he testified that he was very blunt with Petitioner and her family about the risks of trial. He further testified that he made Petitioner and her family aware of the likely outcome of trial and of Petitioner's significant exposure if convicted at trial. Trial counsel also introduced Petitioner to physician's assistant Mark Bullard, who explained the high likelihood of conviction based on the victim's injuries. Finally, although trial counsel expressed a desire to obtain a lesser plea deal, he never presented a deal to Petitioner that was less than 12 years and she elected not to accept the 12 year offer. It is understandable that she would depend on trial counsel for guidance on what she should do, trial counsel made it clear that it was her decision alone on whether to accept the offer or go to trial.

Applying these facts to the 3-part *Nesbit* test, there is ample evidence that Petitioner was adequately advised of the alternatives and the likely consequences, trial counsel was not deficient in handling the plea process and Petitioner was not prejudiced.

(emphasis added).

Again, the record supports the conclusion of the post-conviction court. Trial counsel testified that although Petitioner had no prior criminal record, she faced a lengthy sentence due to the seriousness of the offenses. He said that he was "always looking for a way to resolve [Petitioner's] case out of court." Trial counsel could not specifically recall if there was a twelve-year offer from the State, but it was always his practice to convey settlement offers to his clients, and he would always counsel them as "best" he could. Trial counsel noted that due to the language barrier in Petitioner's case, he usually spoke with her through an interpreter. He said that he would have communicated the seriousness of Petitioner's case to her and her family. Trial counsel testified that he told Petitioner that it was ultimately her decision on whether or not to accept a plea offer. He would have never told Petitioner that he could beat a plea offer of twelve years at one-hundred percent, and he would have never given Petitioner or her family any assurances that he would be successful in reaching an acquittal at trial. In his professional opinion,

trial counsel believed Petitioner understood her right to go to trial and that she "[m]ost definitely" made the decision to go to trial.

Petitioner claimed that she did not understand the seriousness of the charges against her at the time that she went to trial. However, the post-conviction court did not find her credible and noted that "Petitioner contradicted herself several times when asked if she understood about [ ] the nature of her charges, and overall did not carry much credibility in this area." Petitioner admitted at the post-conviction hearing that she knew that some of the victim's injuries were serious. She also admitted that she understood the trial procedure, the role of witnesses, and the function of the jury. Furthermore, trial counsel thought that he communicated to Petitioner that the victim's injuries appeared to be non-accidental, and there was a good chance that the jury would convict her based on the medical evidence.

In this case, the record shows that trial counsel properly advised Petitioner concerning her options of going to trial or accepting a plea offer from the State, and Petitioner made the decision to go to trial. Petitioner is not entitled to relief on this ground.

Finally, Petitioner contends that she was denied the effective assistance of counsel due to "cumulative errors." Petitioner is not entitled to relief on this ground.

## CONCLUSION

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
THOMAS T. WOODALL, JUDGE